Thank you. And good morning again. Are you ready to switch gears? I'm ready. Okay. There were three on the calendar. One of them you took without argument. So it's easier to do two, I can assure you. I'd again like to just indicate to you that my client Mike Ogden is here with members of his family from Oklahoma. And what I would like to do, I understand that we have a very difficult task here in this case. And what I want to do is fundamentally talk about two cases before I launch into my particular factual considerations. One of those cases we cited is Samples v. City of Atlanta. And the other is Russo v. Sizemore, both of which are cited, I believe, in our briefs. In a Samples case, a young boy was shot and killed, 16-year-old boy, in a case that the 11th Circuit said where the facts were very unclear. The only witness was the police officer who did the shooting. And the police officer claimed in that case that he shot the boy because he had a knife. The knife was found some 40 feet from where the shooting occurred. It was an unopened pocket knife. And there were other facts, including one fact that was of particular note, that a bullet struck the victim in the back. Now, even though the police officer was the only witness and testified that he was threatened and this was a justifiable shooting, the 11th Circuit sent the case back for trial, claiming that there were unresolved facts that ought to be explored and that qualified immunity in that case did not insulate the police officer. In the other case that I want to mention to you, Russo v. Sizemore, in Russo there was a use of a taser, and that case came up in the briefs in the previous case. The court held in that case that the taser was acceptable, but the 22 bullet wounds that followed after that which killed the individual were not. Now, those cases indicate, as we've been arguing consistently, that these use-of-force cases are very factually driven. And the Supreme Court and this Court has repealed as much. To cut to what I think is a concern of mine, the case that really hurts here, I think, is Glanford. Do you remember Glanford? I've got that here. Let me get my notes. Go ahead. It's the stored one. Yes. This happened in Sacramento, if I remember correctly, by noon in December. I remember that, yes. This is the guy who was entering his own house. He's carrying a Civil War, I think, vintage sword. And it turns out he's crazy. I mean, he's, to use a non-scientific term, a truly, I mean, somebody who was suffering from a real mental problem, and he's running around carrying a sword. He's not anywhere near anybody. I mean, I must tell you, I saw that case, and I was troubled by it when it came out. But it is the law of our circuit. Well, it is the law of our circuit. But then, again, I would also suggest to you that you look at – give me a moment – you look, again, at the facts of the Brousseau case, which also came out of this circuit. It was reversed by the nice – But that case, though, the Blanford case, I'm also stuck on that. Okay. In the sense that because the officers there were entitled to qualified immunity because the court held that they were not on fair notice. And it would seem to me that the facts, even though this case, I believe, was after your case, but it stands for the proposition that the law was not clearly established. That's what that case holds, and we're bound by that. In your case, the facts seem worse for your client in the sense that people are in proximity, that the officer has been disabled by the barrel repellent, another person has been sprayed with the barrel repellent,  Whereas in the Blanford case, the officers – you know, it was a saver, and they weren't right in the immediate proximity. The person was going into the house, and they were still found to be entitled to qualified immunity. And your facts seem worse for your client. Well, I understand that, and I'm concerned about that case. But, again, I would take you back to the Supreme Court's decision and the Ninth Circuit's decision in Brousseau v. Haugen, which is a qualified immunity case. In that case, the police officer woman came upon an individual who had been involved in an altercation. They had to chase him. He jumped into a car and was driving away. He was threatening people in the area with his erratic driving, and she shot him one time in the back. Now, the Ninth Circuit originally said that the police officer was not entitled to qualified immunity, and the case could go forward, and the Supreme Court reversed. But there was never any doubt – and this is a December 2004 decision – there was never any doubt that when the person was going away, that the use of force in that circumstance constituted a violation of his rights. He was driving away. But under the circumstances, because she acted out of concerns for other people in the area, the court said, well, we're going to give her qualified immunity for doing something which nonetheless is a violation of the individual's constitutional rights. That is what happened in 2004. Now, in this case, which is why I cite to you the sample case, in this case you have a situation where you have a whole series of events. And the question is, at what point in time did the police officer know, or should he have known, that he should stop shooting? Here you have an impaired police officer, by his own admission, and he's firing his gun repeatedly at a target that he may or may not be able to see, and he's basing that, theoretically, on protecting himself and the other individual who allegedly was on the ground, although the other individual says, no, I wasn't on the ground, and I wasn't in any risk. Now, again, the police officer had his perceptions, clearly, just like the police officer in the Atlanta case. But there are facts here, including bullet wounds in the back, which suggest to you that this is not a clear factual situation to determine whether the police officer acted reasonably. I understand the pepper spray is a big problem, or the bear spray is a big problem in this case, just like a sword or just like a weapon of some other sort. But I believe that for the purposes of determining what happened here, that that, again, is the judgment of a jury that should determine that, because there are facts, just like in the cases on which we rely. But what's more aggravated in this, I think, even than the others where officers got qualified immunity, is that the officer was disabled. And I think that there was even evidence in the record that 15 percent of officers in officer-involved shootings are shot with their own gun. And so the fact that the officer can't see, he's in excruciating pain, he's disabled, and the assailant, as opposed to, you know, didn't just flee. He knows that he didn't just flee. He's still in the area. You know, I mean, the Sabre case, the officers weren't disabled. They still got qualified immunity, and they weren't in the immediate sort of layer of threat. And so here you've got someone in his immediate, you know, area. He's completely disabled, unable to protect himself, and he's just not going to wait for someone to get the jump on him. And that's what I think makes this more aggravated than some of the others. Well, that's what he says. And, again, if you go back to the case where there were 22 bullets fired and the person died after already being tasered, obviously already upset, clearly a threat to people in the area. And yet in that situation, qualified immunity was not provided for the continual shooting because it was unnecessary, or at least a jury could decide that it was unreasonable. And unless in this case you're able to satisfy yourselves that a reasonable jury could not find that the conduct was violative, then it's got to go to a jury. And, again, I mentioned earlier there was an Alaska case, I think, Judge Kuczynski, a couple of years ago that you sat on where virtually the same process, although different facts, were involved where somebody was shot and the question was it was unclear what happened. So it has to go to the jury. Well, is that really the standard on the second prong? I mean, if the officer has to have fair notice, that that conduct to a reasonable officer would not have been justified. So it isn't really the standard that we don't know. Because we don't, there are disputed facts within this. There's no two, was he backing up, was he coming forward, any of those things. But the question that we have to ask isn't do we know exactly what happened. I mean, don't we have to, it goes back to the officer of what he was on fair notice of and what a reasonable officer would have thought in that situation. Am I wrong? No, but I think you're only partially correct. And that is that we have had many, many shooting cases now. And I understand there are questions about what we talk about with deadly force versus other kinds of force. But certainly in cases where gunshots have killed people, the courts have very seriously looked at that situation to look at the mental process the police officer has gone through to determine whether the use of that level of force is authorized and necessary in those circumstances. And unless they can decide that a reasonable jury could not find the person's conduct to be unreasonable, we don't afford them qualified immunity in the use of that level of force. What do you think the officer should reasonably have done after he was gas sprayed? He says he can't see anything and he's excruciating pain. What's he supposed to do? Well, again, if there were evidence that my client was touching him or was close enough and there's some question about whether he was any more than four feet away... No, no, don't change any of the other facts. If the police officer... Change only this one. He's not there to pull the trigger. I mean, he's about to pull his gun and pull the trigger. And we should stop the action and bring him a lawyer. And you are the lawyer and you say, Mr. Officer, before you, you know, in this sort of split second here, before you pull the trigger, let me tell you what the law is and here is what you should do or what you can do. So what else are we going to tell him? I would stop the action at the point where he's already fired the initial shots, where he's already struck the individual, and the individual, according to some accounts, is no longer approaching him that the officer can't see. Mr. Lucia can't see or isn't there, and the only other witness who sees this seems to suggest that he was not continuing to approach or come toward the officer. In those circumstances, the officer should not fire additional shots. But if you don't know that because you can't see because the person has sprayed bear spray in your eye, how can you be, you know, how can we impute that knowledge into the officer's calculus? Well, I think that cuts two ways. On the one hand, I agree with you that the officer probably is frightened and is not clear about what's happening. On the other hand, if the officer is firing and he's blind, he could be firing at other innocent people who've come into the area. And I think we don't want to encourage that kind of conduct. We don't want to encourage police officers and tell them it's okay if you don't know what's going on to use your gun to continue to shoot somebody under circumstances where you don't know what the impact of that action is going to be. And I think that's a policy consideration which is overriding in this case and which, again, a jury could find in this situation. Counsel, Maui County submitted a number of statement of facts in support of their motion for summary judgment, and you admitted to a number of these facts, is that correct? We certainly did. My client is not available to contest what they're saying happened. So we can't, again, as in the Atlanta case, we can't contradict what the police officer is saying. We can only point to whatever other evidence is out there, including the coroner's report and so forth. But that now means that at this point you do concede, for example, that I'm reading from their facts, number 47, Officer Pacheco was concerned that Ogden would take his gun and use it to kill him and or Lucia. Officer Pacheco says that. Now, I will tell you, Judge Bivey, I've heard that in every shooting case that I've been involved in. And if you look at the argument we had before the district court judge, I mentioned to him a couple of cases in which I've heard that said and I've heard it to have credibility because the person is on top of the officer and he feels them reaching for his gun. But I don't believe that just Officer Pacheco saying that here makes that a legitimate issue. Well, you could contest Officer Pacheco's credibility by questioning him in court. We could if we had to. You could contest that. Yes. But for purposes of summary judgment, you conceded the truthfulness of the statement. No, I only conceded that that's what he would say. I did not concede that's what he thinks and what he says. He's going to think that. I concede he thinks that. I concede that. Officer Pacheco believes, as he said, that if he didn't shoot him, that Mr. Ogden might come and take his gun and hurt him. I can't contest that that's what he's going to say. But the credibility and reasonableness of that under the circumstances of this case, if we went to trial, I certainly could contest. I could contest it in his deposition. But because of this threshold issue, we've never gotten that far. So to get back to my question, so you can now, he's shot a couple of rounds and the suspect is down. But it won't stay down. And he's not stopped the action. So what you're telling him is what? Stop shooting and do what? I tell him he's got to stop shooting until he's able to discern reasonably what is happening and what the situation is. Because if he continues to shoot, one, without knowing whether the person is going to continue to assault him or not, and two, when he's impaired, that that is the height of irresponsibility. That's what I tell him. So stop shooting and hope that you've wounded him seriously enough that he can't come at you and take away your gun and shoot you with it? The officer can't just hope. He's got to know. When you employ deadly force, you can't hope. You can't be subjective. You have to have as objective an approach to the situation as you can under those circumstances because there's no undoing it. And all the courts have recognized that. So before you go to the ultimate step of employing force that can take a life, you have to know what you're doing and not hope. And that is part of what the problem is in this case. We could go to a jury and a jury could find, I can see that Officer Pacheco was entirely justified based on what he knew and thought, but they could also decide otherwise. And that's why we believe the case should not have been decided by Judge Seabright and we should have an opportunity to try this matter. Okay, thank you. Thank you. We'll go to the other side. Good morning. Deputy Corporation Counsel appearing on behalf of the County of Maui and Officer Clifford Pacheco. I think part of the problem with Mr. Seitz's arguments before this court is, as Judge Bybee has pointed out, that he conceded many of these issues that he now claims are genuine issues and material fact below when the summary judgment motion was pending. For example, he conceded that the bare repellent or deterrent could cause reparable eye damage to Clifford Pacheco. He also conceded that the, or failed to dispute, that the gunshot wounds to Mr. Ogden were, according to Dr. Manukian, the coroner in this case, placed in a position where Mr. Ogden was standing in a bladed stance with his arm out in front of him, which is consistent with him advancing on Officer Pacheco while spraying the bare deterrent. And, in fact, there's absolutely no contesting over the fact that Mr. Ogden continued to spray the bare deterrent at Officer Pacheco as he was being shot. That's conceded by the plaintiff in below. And I think we made a very large record of going through and pointing out to you point by point every single fact that they concede. And there's not just Officer Pacheco that would attest to these facts. John Lucia, who was there with him, also provided not just a deposition but also declaration regarding these facts that support Officer Pacheco's use of deadly force. Summary judgment was proper and appropriate in this case. It's our position that the court's order should be affirmed. Well, it's a little troubling to have an officer shooting when he can't see what he's shooting, or whether it's justified. I mean, for all he knew, if he can't see, the suspect may be moving away. I don't think that that's an accurate representation by Mr. Sykes. If you look at Officer Pacheco's declaration, what he says is that he had to continually strobe his eyes in order to see a silhouette of Mr. Ogden, and his vision at that time was that he was coming towards him. Not that he couldn't see at all. I'd further point out, and what else supports this testimony by Officer Pacheco, is that he hits Mr. Ogden four times. So it's not as though this is some wild shooting spree where there's bullets flying all over the place. He actually makes contact four times out of five. On the first set, or there were five total shots? Five total shots. It's my understanding that there were two in the first volley, three in the second. Are officers in Hawaii trained to respond to bear spray? Did he know what to do? They are trained in our state to deal with capstan, or oleoresin, capsicum, pepper spray, mace. But we do not have bears in this state, so it is not as though this is something that they would have been trained to use. We train our officers to strobe their eyes, and that's a part of Officer Pacheco's declaration. Does bear spray have some other alternative use in Hawaii? It's illegal in our state. But the pepper spray is not? If you're an armed law enforcement officer, it is not. Illegal for all other purposes. I believe so. But bear repellent is not something you could buy in a store here because we don't have bears. So this is a completely different realm for him. And if you look at his declaration, you'll see that what he's talking about in terms of trying to deal with it is that he's strobing and strobing and strobing, but the film on his eyes is thick and burning, and the pain is the worst he's ever felt in his life. So do we have any cases about dealing with bear spray, where it fits on the spectrum of, you know, the continuum towards gunshots and tasers and all of that? Are you referring to the United Police Department's use of force continuum? Well, no, basically in terms of on the second prong of saucier, you know, what would be clearly established. Do we have any cases out there that talk about bear spray? There are none directly on point. However, there are cases that we do cite in our brief in regards to pepper spray that's been found to be a dangerous instrument or dangerous weapon. And since bear spray, if you're going to just work through that, since bear spray is considered an industrial strength version of mace or pepper spray, the natural conclusion would be that it's also a dangerous instrument, not deadly. Okay. Thank you. Mr. Arnn, would you like to take the microphone? No, I think I've said everything. Yes. No, I think I've said everything with respect to the arguments that I would like to say. Thank you. Thank you.
judges: Kozinski, Bybee, Callahan